UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CHAMMA K. BRANDON,                 :
              Plaintiff,        :
                                 :
v.                               :       **OPINION AND ORDER**
                                 :
MARK ROYCE, LESLIE MALIN, and JOHN V.  :       16 CV 5552 (VB)
WERLAU, in their official and individual     :
capacities,                         :
              Defendants.     :
------------------------------------------------------------x

Briccetti, J.:

      Plaintiff Chamma K. Brandon, proceeding pro se and in forma pauperis, brings this

action under 42 U.S.C. § 1983, alleging defendants Mark Royce, Leslie Malin, and John V.

Werlau violated his First Amendment right to free exercise of religion and Eighth Amendment

right to be free from cruel and unusual punishment.

      Now pending is defendants' motion for summary judgment.  (Doc. #61).

      For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN

PART.

      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

      The parties have submitted briefs, statements of material facts, supporting affidavits,

declarations, and exhibits, which reflect the following factual background.

      At all relevant times, plaintiff was an inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS") and incarcerated at Sing

Sing Correctional Facility ("Sing Sing").

I.      Eid al-Adha Meal

     A.      Eid al-Adha

Eid al-Adha (feast of sacrifice) "is a major day of observance for Muslims Worldwide. It consists of a special prayer service, food, drink and other religious activities." (Doc. #63 ("Dawkins Decl.") Ex. D at DEF 000129).[1] According to plaintiff, Eid al-Adha is a four-day celebration.

DOCCS issues an annual religious holy day calendar, and the 2015 calendar states Eid al-Adha was to be observed on September 23, 2015. The calendar says this about observance of Eid al-Adha:

> [A]n observance of a special prayer and feast on the tenth day of the month of Dhul-Hijah; observed through a special Eid prayer in the morning, no later than 9:30 AM. In accordance with Islamic tradition, offenders should receive a ghusl (shower) and use their oil before going to the Eid Prayer, and/or event. Because breakfast can not be eaten before the prayer, participants should be given refreshments immediately after the prayer.

(Dawkins Decl. Ex. B at DEF 000074).

In a memorandum dated August 24, 2015, Imam Young, the "Coordinating Chaplain," indicated the Eid service would occur on September 23 or 24, 2015. (Dawkins Decl. Ex. D at DEF 000129). The memorandum also made specific provisions for the celebration of Eid al-Adha at Sing Sing: Muslim inmates at Sing Sing would (i) commemorate Eid al-Adha with a prayer service and fellowship activities; (ii) be permitted to take showers in the bath house or housing unit in the morning on the day of the Eid prayer; (iii) be provided with a morning meal in the Masjid (mosque); (iv) be provided with an afternoon meal prepared by Muslim cooks; and (v) be permitted to take their Islamic attire in the chapel. In addition, the memorandum provides,

---

[1]    "Doc. #__ at DEF __" refers to the Bates-stamped numbers on the bottom of defendants' exhibits; "Doc. #__ at ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing system

"A feed-up for the noon meal shall be provided for Muslim inmates in Keep-lock, SHU, or the Hospital." (Id.).

In a subsequent memorandum dated September 17, 2015, Jeff McKoy, DOCCS Deputy Commissioner for Program Services, wrote, "Based on this past weekend's sighting of the moon," Eid al-Adha should take place on September 24, 2015. (Dawkins Decl. Ex. E at DEF 000134).

On September 24, 2015, the Muslims at Sing Sing held Eid prayer, and they ate breakfast in the mosque in the morning and an Eid lunch meal in the mess hall in the afternoon. The parties agree plaintiff attended the Eid prayer and received the Eid breakfast and lunch on September 24.

B.      September 26 Event

In addition to the activities scheduled for September 24, 2015, DOCCS scheduled a special event for Muslim inmates on September 26, 2015 (the "September 26 event"). Defendants contend the September 26 event was a "family event" that was "not necessarily related to the Eid." (Dawkins Decl. Ex. N ("Young Decl.") ¶ 12). According to Imam Young, the September 26 event was "not a religious event," and could occur days or weeks after Eid al-Adha. (Id. ¶ 11).

John Mahoney, DOCCS Recreation Program Leader II, prepared a special event package for the September 26 event. The special event described in the package is titled, "Eid ul-Adha Event." (Dawkins Decl. Ex. A ("Special Event Package") at DEF 000042). The package's menu page contains the following hand-written notation: "No Facility Prepared Food will leave the Event Area. Any Extra food will be Disposed of at the end of the Event." (Id. at DEF 000043). Beneath the notation is the signature of defendant Mark Royce, the Deputy

Superintendent of Security at Sing Sing. Royce states he instructed someone to add the menu page notation "for safety and security reasons":

> There is serious concern about the security risks involved. Of concern is that contraband could be secreted in the food. There is no way to search the food, prior to it leaving the mess hall. Additionally, the feed-up trays could be used as a means to influence other inmates. Bartering or selling among inmates can lead to extortion and bribery, as well as theft, all of which undermine the safety and good order of the facility.

(Dawkins Decl. Ex. K ("Royce Decl.") ¶ 5).

According to Royce, he was presented with the special event package on September 8, 2015, which he reviewed and signed the same day. Royce states this accords with normal practice: for special events for Muslim inmates, the recreation program leader drafts special event packages, the Imam signs off, and the package is presented to the executive team (of which Royce is a member) for approval. The package is then distributed to different departments, including the mess hall, so the staff will know what arrangements have been made regarding the distribution of food.

C.     Withdrawal from the September 26 Event

Plaintiff was included in the special event package's list of inmates approved to attend the September 26 event. However, plaintiff asserts that at Jumu'ah services on September 25, 2015, Imam Young announced that superintendents had told him the September 26 event was over capacity. According to both plaintiff and his fellow inmate Jerry Johnson, the administrative chaplain clerk, Imam Young said that "if some of the inmates were willing to voluntarily withdraw from attending the Eid Celebration, all of the invited guest[s] would be able to attend." (Doc. #72 ("Johnson Decl.") ¶ 5; Doc. #74 ("Brandon Decl.") ¶ 5). Moreover, plaintiff and Johnson assert that Imam Young "assured that as a condition to the voluntary withdrawal, the volunteers would be provided a feed-in meal in commemoration of the Eid

Celebration." (Brandon Decl. ¶ 6; see also Johnson Decl. ¶ 6). The parties agree that plaintiff voluntarily withdrew from attending the September 26 event.

Further, plaintiff attached to his declaration in opposition to the instant motion a chart entitled "Prayer Service Religious Feed-in Trays," dated September 25, 2015, and purportedly from Imam Young to the mess hall supervisor. (Brandon Decl. Ex. 1 at ECF 11). Plaintiff is included on the list. Plaintiff also testified he was not present when the list was printed and that he does not know who drafted it; he received it from an inmate. Plaintiff does not remember which inmate gave him the list but believes it was a chaplain, because only a chaplain would have had access to it.

Imam Young, however, states he did not ask inmates to voluntarily withdraw from the September 26 event in exchange for a feed-up tray. Indeed, Imam Young asserts he did not generate or sign a feed-up list or instruct inmates to prepare feed-up trays on September 26, and at least once informed plaintiff that he was not entitled to a feed-up tray on September 26. In addition, according to Imam Young, feed-ups must be written into the special event package ahead of time, and no feed-ups were written into the special event package for the September 26 event.

Likewise, defendant Lesley Malin, DOCCS Deputy Supt. for Program Services, and Royce state they were not aware of any feed-up list for the September 26 event. Malin also asserts the executive team would not have approved an arrangement involving feed-up trays because of the security risks involved. According to Malin, feed-up trays could be used as currency, to influence other inmates, or to transfer contraband, and "could pose a health risk in that inmates can get sick if they choose to eat the food after holding it in their cells for days." (Dawkins Decl. Ex. L ("Malin Decl.") ¶ 19).

D.     Disposal of Feed-Up Meals

Plaintiff did not attend the September 26 event or receive a feed-up tray.  Per the declaration of fellow inmate John McClellan, Imam Young had directed McLellan and other inmate-helpers to prepare the feed-up trays for delivery to the inmates on the list attached to plaintiff's declaration.  But McLellan states Imam Young left soon after giving that instruction, and another lieutenant asked about the trays.  McClellan and other inmates informed the lieutenant "why they were prepared and the significance" of the meal, and suggested the lieutenant consult with Imam Young before ordering them to throw the trays away.  (Doc. #3 Ex. D ("McClellan Decl.") at ECF 39).  However, according to McClellan, the lieutenant ignored him and ordered the inmates to throw the trays out.

Indeed, defendant Lt. John V. Werlau states he ordered the extra food from the September 26 event be disposed of.  According to Werlau:  (i) the special event package did not contain any feed-up provisions or list of inmates who should receive feed-up meals; (ii) the special event package in fact contained a provision specifically prohibiting prepared food from leaving the event area and ordering disposal of extra food; (iii) Werlau believed Sing Sing's policies and procedures required paperwork approving the transportation of food from the mess hall to the housing blocks; and (iv) Werlau had spoken to Royce by telephone, and Royce had verified that no food should be allowed to leave the mess hall.  Werlau also cited safety concerns involved in providing feed-up meals:  in addition to the concerns Malin and Royce expressed, Werlau stated there were "hygienic reasons for not allowing inmates to have a meal tray in their cells such as to maintain the cleanliness and prevent rodents, etc."  (Dawkins Decl. Ex. M ("Werlau Decl.") ¶ 14).

Plaintiff states he complained to Young about not receiving a feed-up meal. Plaintiff asserts Young "consoled me, while at the same time condemning defendant Werlau for ordering Inmate McClellan and the other inmates to discard the meals." (Brandon Decl. ¶ 14). Moreover, according to plaintiff, he told Young he intended to file a grievance, and Young encouraged him to do so.

Plaintiff also avers he complained to fellow inmate Johnson (the administrative chaplain clerk). Johnson concurs and states he drafted and mailed a formal complaint to Malin, which he attached to his declaration in opposition to the motion for summary judgment. (Johnson Decl. Ex. 3 at ECF 18). According to Johnson, he did not receive a response. However, Malin says she was not aware of plaintiff's allegations that he had not received a feed-up meal for the September 26 event until she read the complaint in this lawsuit.

II.  Cell Lighting

A.  Installation of Light Bulbs in November 2015

Plaintiff states he was initially housed in housing block B when he arrived at Sing Sing. He was then relocated to housing block A on July 29, 2015, and back to housing block B on August 8, 2015. On or about October 26, 2015, a work order was submitted stating light bulbs in housing block B were "out of order." (Dawkins Decl. Ex. G at DEF 000318). Plaintiff, however, states Royce ordered installation of new light bulbs because it was not bright enough on plaintiff's housing block. In contrast, Royce asserts he never stated the lights on housing block B were not bright enough.

According to Sing Sing Maintenance Supervisor Paulo Lopes, on or about November 23, 2015, he sent inmate workers to replace the light bulbs. The parties attest to different specifications regarding the new lightbulbs. Mr. Lopes asserts approximately five "200 watt,

Luma Pro, Model No. 5MPX4, Compact Fluorescent light bulbs were installed." (Dawkins Decl. Ex. O ("Lopes Decl.") ¶ 4). Lopes further states the contractor had accidentally sent the Luma Pro bulbs, and the accident was not discovered until after inmates filed grievances complaining about the bulbs' brightness. According to Lopes, on or about December 21, 2015, he instructed workers to replace the light bulbs with "68 watt equivalent 300 watt, Compact Fluorescent light bulbs." (Id. ¶ 9).

Plaintiff, on the other hand, asserts "several 1000-watt wide-range high intensity stadium-styled light bulbs were installed" ten to fifteen feet away from plaintiff's cell, "blanketing the cell in constant illumination." (Brandon Decl. ¶¶ 21, 23). According to plaintiff, he recognized the light bulbs from his prior work as a maintenance worker and facility manager at "Sportime Tennis," a tennis facility in Manhattan, where he handled the same type of bulbs. (Id. ¶ 22). Plaintiff testified that the bulb "looks exactly the same, the brightness of it seems the same, the illumination of it seems the same, . . . and even certain officers that walk past said the same." (Dawkins Decl. Exs. I & J (together, "Brandon Dep.") at 211). However, plaintiff also testified that he "never got a chance to actually inspect these bulbs" (id.); "never physically saw or handled the light bulbs" himself (id. at 423); did not see any writing on the bulbs indicating their wattage (id.); and did not know the brand of the bulbs (id. at 210).

B.    Constant Illumination

Plaintiff asserts the purported 1000-watt light bulbs "were left in constant illumination 24-hours/7-days a week." (Brandon Decl. ¶ 21). Moreover, according to plaintiff, those light bulbs were replaced with bulbs "similar in intensity" that "also remained in constant illumination." (Id. ¶ 24).

Plaintiff avers that after the installation of replacement bulbs near his cell, he was relocated three times within housing block B—on August 16, 2016, January 10, 2017, and January 17, 2018—yet until at least January 17, 2018, he remained subject to constant illumination. Plaintiff states he was not allowed to block or shield himself from the light, and the illumination "caused a host of medical ailments, namely: sleep deprivation; insomnia; severe migraines; reoccurring episodes of dizziness; hallucinations, and severe psychological trauma." (Brandon Decl. ¶ 29).

Plaintiff also states in housing block A the lights go out every night at around 10:30 p.m. and are turned back on at around 6:00 a.m. In addition, fellow inmate Anthony Arriaga states he was transferred to housing block A in October 2017, and concurs that "every night, at or around 10:30 p.m., among other light bulbs, the lights illuminating L and P Galleries are turned off; and on or about 6:00 a.m. they're turned back on." (Arriaga Decl. ¶ 21). Plaintiff asserts there is no security classification or other difference between the inmates housed in housing blocks A and B. Royce, however, states there is no difference in the lighting policies on housing blocks A and B.

C.     Grievances and Decisions

Plaintiff sent a letter to Royce dated November 28, 2015, complaining about the newly-installed bulbs and the constant illumination. Royce responded by memorandum dated December 11, 2015, stating plaintiff's complaint was "being investigated and followed up by the facility Maintenance Department." (Dawkins Decl. Ex. H at DEF 000135).

Plaintiff also filed a grievance dated November 28, 2015, complaining of the same issues. The inmate grievance review committee ("IGRC") responded on January 7, 2016, stating it agreed with plaintiff's grievance. The IGRC's response also noted that the bulbs installed in

November 2015 had since been changed, and that the "DSS" should address which security lights stayed on and which were turned off. (Dawkins Decl. Ex. P ("Grievances") at ECF 3). Plaintiff agreed with the IGRC response and appealed to the superintendent. The superintendent accepted the grievance in part, stating: "Investigation reveals the light bulbs on U Gallery in [housing block B] were in fact placed there in error. Maintenance staff immediately replaced the light bulbs after being advised of the error. Grievant advised to sign up for sick call to address their medical concerns." (Id. at ECF 4).

Plaintiff appealed the superintendent's decision to DOCCS's Central Office Review Committee ("CORC"), which unanimously upheld the superintendent's decision: "CORC notes that the upper tier lights are kept on 24 hours a day 7 days a week for security reasons. CORC also notes that the wrong bulbs were used and that they have since been replaced. CORC advises the grievants to address medical concerns via sick call." (Grievances at ECF 10).

In addition, Royce states staff and inmate safety requires that lights stay on in the housing blocks at Sing Sing "24 hours per day, 7 days a week." (Royce Decl. ¶ 10). According to Royce:

> The housing blocks are enormous. The lights are sporadically spread out on the housing block. They allow light into the cells for visual counts and inspections. When making rounds, an officer must be able to see that the inmate is alive and breathing. It also allows the officer to make sure that the inmate does not have any contraband or weapons that may be used to harm himself or others. . . .
>
> The lights on the housing blocks cannot be completely turned off because during the night, Corrections Officers need to be able to see inside the cell to check on the well-being of each inmate.

(Royce Decl. ¶¶ 11, 16).

**DISCUSSION**

I.      Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing

law . . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot

preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a

reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir.

2010) (citation omitted).  It is the moving party's burden to establish the absence of any genuine

issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir.

2010).

If the non-moving party has failed to make a sufficient showing on an essential element

of his case on which he has the burden of proof, then summary judgment is appropriate.  Celotex

Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence,

summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50.  The

non-moving party "must do more than simply show that there is some metaphysical doubt as to

the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."

Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations and quotation

omitted).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him.  Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial.  Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II.      Free Exercise Claim

Defendants argue plaintiff's free exercise claim fails as a matter of law because defendants have a legitimate penological interest in preventing food from being transported to the housing blocks.

The Court agrees.

"Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion."  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (internal citations omitted).  To prove a violation of his First Amendment right to free exercise of religion, an inmate must show "at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."  Salahuddin v. Goord, 467 F.3d 263, 274–75 (2d Cir. 2006) (internal citation omitted).  "The defendants then

bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." Id. at 275. Finally, the inmate must show the articulated concerns were irrational. Id.

A regulation that burdens a protected right must be reasonably related to a legitimate penological interest to pass constitutional muster. Salahuddin v. Goord, 467 F.3d at 274. Courts evaluate four factors in determining reasonableness:

> [(i)] whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [(ii)] whether prisoners have alternative means of exercising the burdened right; [(iii)] the impact on guards, inmates, and prison resources of accommodating the right; [(iv)] and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

Id. (citing Turner v. Safley, 482 U.S. 78, 90–91 (1987) (footnote omitted)).

Here, defendants have established as a matter of law that they had a legitimate penological interest in prohibiting the provision of feed-up meals to inmates. Indeed, defendants identify numerous legitimate governmental objectives, citing (i) the concern that inmates could secret contraband in the food, which cannot be searched before it leaves the mess hall; (ii) the ability to use feed-up trays to influence other inmates through bartering, selling, extortion, and bribery; (iii) the risk of theft; (iv) the health risks involved if inmates choose to eat the food after holding it in their cells for days; and (v) hygienic reasons, including maintaining cleanliness and preventing rodents. Plaintiff offers no reason why any of these valid penological interests is irrational.

Moreover, defendants' regulation, in this case, was reasonably related to the valid penological interests. In particular, plaintiff had an alternative means of exercising his right—by attending the September 26 event and receiving the very meal of which he was deprived.

Accordingly, defendants are entitled to summary judgment on plaintiff's free exercise claim.

III.  Eighth Amendment Claim

Defendants argue plaintiff's Eighth Amendment claim fails as a matter of law because plaintiff fails to establish Royce was deliberately indifferent to his health and safety.

The Court agrees that plaintiff's claim based on the installation of light bulbs in November 2015 fails as a matter of law. However, genuine issues of material fact preclude summary judgment on plaintiff's claim to the extent it is based on the constant illumination of his cells from December 11, 2015, through at least January 17, 2018.

To establish a violation of Eighth Amendment rights, an inmate must satisfy an objective prong and a mens rea prong. Namely, an inmate must show (i) "a deprivation that is 'objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's necessities,'" and (ii) "a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety." Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001).

To satisfy the objective element, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal citation omitted). "Thus, prison officials violate the Constitution when they deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." Id. "While the Eighth Amendment's prohibition against cruel and unusual punishment 'does not mandate comfortable prisons,' the

conditions of confinement must be at least 'humane.'" Gaston v. Coughlin, 249 F.3d at 164 (internal citations omitted)).

"[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." Walker v. Schult, 717 F.3d at 126. Therefore, "[r]equiring inmates to live in constant illumination can . . . under certain circumstances, rise to the level of an Eighth Amendment violation." Collins v. Fischer, 2018 WL 1626528, at *6 (S.D.N.Y. Mar. 30, 2018) (quoting Holmes v. Fischer, 2016 WL 552962, at *17 (W.D.N.Y. Feb. 10, 2016)).[2]

The mens rea component is satisfied by showing "the defendant 'acted with more than mere negligence' by, for instance, 'knowing of, and disregarding, an excessive risk to inmate health or safety.'" Garraway v. Griffin, 707 F. App'x 16, 19 (2d Cir. 2017) (summary order) (alterations omitted) (quoting Walker v. Schult, 717 F.3d at 125). "Evidence that a risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." Walker v. Schult, 717 F.3d at 125 (internal quotation omitted).

Courts' analyses of claims based on constant illumination are "'fact-driven, based upon the degree of illumination, the discomfort that it caused, and the penological concern for the lighting.'" Booker v. Maly, 2014 WL 1289579, at *18 (N.D.N.Y. Mar. 31, 2014) (collecting cases), aff'd, 590 F. App'x 82 (2d Cir. 2015) (summary order); see also Shepherd v. Ault, 982 F. Supp. 643, 647 (N.D. Iowa 1997) ("[E]ven the question of whether constant lighting serves a legitimate penological purpose depends upon the circumstances of the case."). Courts also look to the length of time plaintiffs are subjected to the constant illumination. See Shepherd v. Ault,

---

[2] Because plaintiff is proceeding pro se, he will be provided with copies of all unpublished opinions cited in this ruling. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

982 F. Supp. at 648 (holding plaintiffs' claims that they were subjected to 283 and 550 nights under constant illumination gave rise to "[v]ery different inferences" than constant illumination for a shorter period of time).

Courts have found constant illumination involving low-wattage bulbs—from five-watt fluorescent bulbs to a single forty-watt bulb—permissible under the Constitution.  See McGee v. Gold, 2010 WL 5300805, at *5 (D. Vt. Aug. 3, 2010) (collecting cases), report and recommendation adopted sub nom. McGee v. Pallito, 2010 WL 5389996 (D. Vt. Dec. 20, 2010), vacated and remanded on other grounds sub nom. Kimber v. Tallon, 556 F. App'x 27 (2d Cir. 2014) (summary order).  Yet one circuit court reversed a district court's grant of summary judgment because plaintiff had produced evidence that "large florescent lights directly in front of and behind his cell shone into his cell 24 hours a day, so that his cell was constantly illuminated, and [plaintiff] had no way of telling night or day," causing the plaintiff sleeping, mental, and psychological problems.  Keenan v. Hall, 83 F.3d 1083, 1091 (9th Cir. 1996) (internal quotation omitted), opinion amended on denial of reh'g, 135 F.3d 1318 (9th Cir. 1998).

Plaintiff's claim against Royce based on the installation of the so-called 1000-watt light bulbs in November 2015 fails as a matter of law because plaintiff fails to satisfy the mens rea component.  The record contains no evidence that Royce consciously disregarded a risk to plaintiff's health or safety.  Indeed, plaintiff has not adduced any evidence that Royce was involved in the installation of the light bulbs in November 2015 or to support plaintiff's allegation that Royce said housing block B was not bright enough.  In fact, the only evidence in the record is that Maintenance Supervisor Lopes, a non-party in this case, ordered inmates to

install light bulbs that a contractor had mistakenly provided.[3]  Moreover, there is no evidence Royce delayed the light bulbs' replacement after inmates complained.

That said, however, there are genuine issues of material fact preventing summary judgment on plaintiff's claim based on the constant illumination of his cells beginning on December 11, 2015.  There are several material issues of fact regarding whether the constant illumination to which plaintiff was exposed posed an unreasonable risk of serious damage to plaintiff's health.  First, the light bulbs that defendants assert plaintiff was exposed to during that time—68 watt equivalent 300 compact fluorescent bulbs—are of substantially higher wattage than in cases in which summary judgment has been granted.  Cf. Booker v. Maly, 2014 WL 1289579, at *18 (three-watt LED night light).  Second, plaintiff attests that the light bulbs were only ten to fifteen feet away from his cell, yet he was not permitted to block or shield himself from the light.  Cf. id. at *19 (inmate's cell would normally be dark because of a small window in the door).  Third, plaintiff avers he was subjected to constant illumination until at least January 17, 2018—some 768 days after Royce responded to plaintiff's original complaint on December 11, 2015.  And fourth, plaintiff asserts that he suffered far more than mere discomfort, including migraines, dizziness, and excessive fatigue.

There are also genuine issues of material fact regarding the mens rea component.  Plaintiff has offered sufficient evidence to permit a reasonable juror to conclude Royce was aware of the harm plaintiff alleged he was suffering from at least December 11, 2015, when he responded to plaintiff's November 28, 2015, letter complaining about the constant illumination and installation of the supposed 1000-watt light bulbs.  Indeed, in that letter, plaintiff specifically identified "24-hour lights" as an issue and stated he was "beginning to develop migraine

---

[3]      Thus, even if Lopes were a defendant, his actions amount to non-actionable negligence.

headaches, dizziness, and excessive fatigue," among other symptoms. (Dawkins Decl. Ex. H at DEF 000136–37).

Finally, there is a genuine issue of material fact regarding whether defendants' proffered penological interests are sufficient to conclude that Royce was not deliberately indifferent.[4] Although Royce states some light bulbs at Sing Sing are turned off at night, defendants have not offered any evidence that an alternative lighting policy serving the same penological interests, but with a less detrimental effect, could not be implemented.

Accordingly, defendants are entitled to summary judgment on plaintiff's Eighth Amendment claim to the extent it is based on the installation of light bulbs in November 2015.

However, summary judgment is denied on plaintiff's Eighth Amendment claim to the extent it is based on the constant illumination of his cells beginning on December 11, 2015.

IV.    Personal Involvement

Plaintiff has presented sufficient evidence of Royce's involvement in the purported Eighth Amendment violation based on the constant illumination of his cells beginning on December 11, 2015, for his claims to proceed against Royce.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Spavone v.

---

[4]    "The precise role of legitimate penological interests is not entirely clear in the context of an Eighth Amendment challenge to conditions of confinement." Quick v. Graham, 2014 WL 4627108, at *9 (N.D.N.Y. Sept. 11, 2014) (quoting Grenning v. Miller–Stout, 739 F.3d 1235, 1240 (9th Cir. 2014)). To the extent consideration of legitimate penological interests is relevant, the Court considers it in analyzing the mens rea prong of plaintiff's Eighth Amendment claim. See id. ("[O]ther courts which have considered penological justification in the context of claims involving continuous prison lighting have related it to the subjective prong of the Eighth Amendment analysis.") (citing Chavarria v. Stacks, 102 F. App'x 433, 456 (5th Cir. 2004)).

N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013) (internal citation omitted).  A supervisor's personal involvement in an alleged constitutional violation may be established if:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).[5]

Regarding the second factor, courts examine the degree of response to plaintiff's complaints.  See Mateo v. Fischer, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010).  Courts distinguish "between summarily denying a grievance and denying it in a detailed response that specifically addresses the plaintiff's allegations."  Id. (internal citations omitted).  Thus, "district courts have found personal involvement based on denying a grievance where (1) the official undertakes some kind of investigation into the initial denial; (2) the official provides a detailed and specific response to the grievance rather than a pro forma denial; or (3) the grievance involves an ongoing violation 'such that the supervisory official who reviews the grievance can remedy it directly.'"  Quick v. Graham, 2014 WL 4627108, at *11 (quoting Burton v. Lynch, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009)).

Plaintiff has adduced sufficient evidence to create a genuine issue of material fact regarding Royce's personal involvement.  First, plaintiff's grievance complained of an ongoing

---

[5]    After Ashcroft v. Iqbal, district courts within this circuit have been divided as to whether claims alleging personal involvement under the second, fourth, and fifth of these factors remain viable.  See Marom v. City of New York, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016).  The Second Circuit has yet to resolve this dispute.  Id.  However, defendants do not argue that Iqbal invalidated the Colon test.  Therefore, for purposes of this motion, the Court assumes the continued viability of the second, fourth, and fifth Colon factors.

violation—namely, the continued constant illumination of his cell. Second, there is at least some evidence Royce undertook an investigation into plaintiff's complaint. After plaintiff sent Royce a letter complaining about the constant illumination, Royce responded by stating plaintiff's complaint was "being investigated and followed up by the facility Maintenance Department." (Dawkins Decl. Ex. H at DEF 000135). And third, there is a material issue of fact regarding whether Royce had the authority to change the lighting policy: Royce's declaration states he "would have directed that maintenance check the light bulbs and replace the light bulbs if they were incorrect," indicating Royce had at least some authority to remedy lighting issues. (Royce Decl. ¶ 15). Moreover, and perhaps most significantly, the IGRC response to plaintiff's grievance specifically identified the Deputy Supt. of Security as the proper party to address plaintiff's grievance as it related to which security lights stayed on and off.

For all these reasons, summary judgment based on the lack of Royce's personal involvement is not warranted.

V.      Qualified Immunity

Royce is not entitled to qualified immunity on plaintiff's Eighth Amendment claim.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996). "[F]or a right to be clearly established for purposes of

a qualified immunity defense, the precise conduct at issue need not previously have been ruled unlawful."  Griffin v. Amatucci, 611 F. App'x 732, 734 (2d Cir. 2015) (summary order) (alterations in original) (quoting Zahrey v. Coffey, 221 F.3d 342, 357 (2d Cir. 2000)).  "Lower court cases in this circuit and cases from other circuits . . . have clearly held that continuing illumination that interferes with an inmate's sleep may, at least in the absence of substantial penological justification, violate the Eighth Amendment."  Quick v. Graham, 2014 WL 4627108, at *12.

Here, plaintiff's right to humane conditions of confinement, particularly those that do not prevent an inmate from adequate sleep, was clearly established at the time of the purported violation beginning in December 2015.  Indeed, plaintiff's specific right to be free from constant illumination was clearly established at that time as well.  Furthermore, for the same reasons stated above in discussing the mens rea component of plaintiff's Eighth Amendment claim, there are genuine issues of material fact regarding whether it was objectively reasonable for Royce to believe that his action did not violate the law.

Therefore, Royce is not entitled to qualified immunity on plaintiff's Eighth Amendment claim at this time.

VI.     Injunctive Relief

On March 8, 2019, plaintiff notified the Court that he had been released from prison.  (See Doc. #79).  Therefore, his claims for injunctive and declaratory relief are moot.  See Pugh v. Goord, 571 F. Supp. 2d 477, 489 (S.D.N.Y. 2008).

Accordingly, plaintiff's claim against Royce in his official capacity is dismissed.

**CONCLUSION**

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

The Court grants summary judgment in defendants' favor on plaintiff's First Amendment free exercise claim and plaintiff's Eighth Amendment claim to the extent it is based on the installation of light bulbs in November 2015. Plaintiff's Eighth Amendment claim against defendant Royce based on the constant illumination of plaintiff's cells beginning on December 11, 2015, may proceed.

**Plaintiff and defense counsel are directed to appear for an in-person status conference on April 9, 2019, at 10:30 a.m., at the United States Courthouse in White Plains, Courtroom 620, at which time the Court will set a trial date and a schedule for pretrial submissions. To conserve resources, to promote judicial efficiency, and in an effort to achieve a faster disposition of this case, the parties, prior to that date, are directed to discuss whether they are willing to consent, under 28 U.S.C. § 636(c), to conduct all further proceedings, including trial, before the assigned Magistrate Judge.**

The Clerk is instructed to (i) terminate the motion (Doc. #61) and (ii) terminate defendants Leslie Malin and John V. Werlau.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

Dated: March 15, 2019
      White Plains, NY                 SO ORDERED:

                                           Vincent L. Briccetti
                                           United States District Judge